UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SHARON WILLIS                                                   PLAINTIFF

V.                                        CIVIL ACTION NO. 3:22-CV-6-KHJ-LGI

WESTHAVEN FUNERAL HOME, INC., et al.               DEFENDANTS

ORDER

Before the Court are Defendants Westhaven Funeral Home, Inc.'s ("Westhaven"), Freddie L. Davis's, Anthony Davis's[1], and Audrey B. Wiley's [55] Motion for Summary Judgment and Plaintiff Sharon Willis's [57] Motion for Partial Summary Judgment. For the following reasons, the Court denies Defendants' motion and finds Willis's motion as moot.

I.      Background

This case arises from Sharon Willis's unpaid apprenticeship with Westhaven. The individual defendants—Wiley, Freddie, and Anthony—own and operate Westhaven. Wiley Depo. [57-1] at 7. Willis delivered flowers to Westhaven and at times filled in as a limo driver as part of her jobs with third-party contractors. *Id.* at 19; Willis Depo. [57-4] at 6. In 2016, she asked about working directly for Westhaven, and she began driving limos for them. *Id.* Eventually, her work for Westhaven expanded to, among other duties, serving as a funeral director. *Id.*

---

[1] To avoid confusion, the Court refers to Freddie Davis and Anthony Davis by first name.

At a meeting for Westhaven funeral directors, the owners told Willis that employees had to be licensed to work funerals. [57-4] at 20. To get that license, Willis received approval through the Mississippi State Board of Funeral Service ("the Funeral Board") to begin an apprenticeship with Westhaven on September 14, 2017. [60-5] at 1.

Westhaven classified its staff as either full-time employees or part-time independent contractors. [57-1] at 10. It paid full-time employees a salary while it paid part-time independent contractors a flat rate based on each service they performed. *Id.*; [57-4] at 20. Defendants paid Willis for body removals and funeral assistance she performed as a part-time independent contractor but did not pay her for the apprenticeship. [57-4] at 20. Willis worked at least 40 hours per week exclusively for her apprenticeship. *See id.* at 15.

One of Westhaven's full-time employees, Ronald Jones, realized his check was docked after he took a day off work. *Id.* at 13. He asked Willis who to report it to, and she told him to call the Department of Labor's Wage and Hour Division ("Wage and Hour"). *Id.* Jones called Wage and Hour in Willis's presence but later reported the incident in person without her. *Id.* at 14. After Jones's report, Wage and Hour began investigating Westhaven. *Id.* Wiley accused Willis of reporting Westhaven, which Willis denies. *Id.* As part of the investigation, Wage and Hour Investigator Julie Castillo interviewed Willis about her apprenticeship hours and wages. *Id.* In that interview, Willis told Castillo about her full-time apprenticeship hours without pay. *Id.*

Wage and Hour's investigation lasted for nearly two years. *See* [60-8] at 1. It ultimately found the FLSA applied to Westhaven as an enterprise engaged in commerce and discovered multiple violations, including employee misclassifications, failure to pay minimum wages and overtime, insufficient recordkeeping, and child labor. [57-8] at 1–2, 4–6. After contacting the Funeral Board, Wage and Hour also determined Willis's apprenticeship constituted an internship that was generally a paid position, and Westhaven was not exempt from its obligation to pay her. *Id.* at 4. Wage and Hour calculated $18,505.34 in regular wages and $1,892.67 in overtime wages owed to Willis for her apprenticeship work. [60-9] at 3.

Castillo met with Wiley on January 28, 2020, to tell her about Wage and Hour's administrative findings. [57-8] at 7–8. Wiley did not contest the findings and agreed to comply with them. *Id.*; *see* [57-10] at 1. Castillo told Wiley the employees could sue Westhaven under the FLSA. [57-8] at 8. She and Wiley reviewed Wage and Hour's Fact Sheet # 77A, which prohibits retaliation against any employee who files a complaint or cooperates in a Wage and Hour investigation. [57-8] at 8; *see* U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet # 77A: Prohibiting Retaliation Under the Fair Labor Standards Act (Dec. 2011), https://www.dol.gov/agencies/whd/fact-sheets/77a-flsa-prohibiting-retaliation. She also told Wiley she would have to pay interns going forward, and Wiley responded she "would just not have any more interns." [57-8] at 7. Wiley then called Freddie to tell him about Westhaven's obligation to pay Willis, who was in the car with Freddie. [60-4] at 17. When Freddie told Willis that Westhaven owed her money,

she initially thought he was joking. *Id.* Later that day, Wiley and Freddie called Willis into a meeting to discuss her back wages. *Id.*

Willis and Freddie have slightly different versions of their conversation in the meeting. According to Willis, Freddie asked whether she would give the money back to Westhaven after she received it. *Id.* When Willis said she wanted to know why she was getting the money, Wiley said "I told you, Freddie. I told you she wasn't going to give it back." *Id.* at 17. Freddie denies asking Willis whether she would give the money back, and instead says Willis said she would not get involved if she was not owed money. [60-2] at 13. Wiley also denies asking Willis for the money. [57-1] at 30. In any event, Willis did not give the money back. [57-4] at 17.

Castillo made a formal report describing Wage and Hour's findings and Westhaven's obligations on January 29, 2020. *See* [57-8] at 9; [60-10] at 4. The next day, Wiley asked Willis to return her key to Westhaven. [57-4] at 31. When Willis told her the key was at home, Wiley asked her to get it and bring it back. *Id.* Willis said she would bring it back when she went home, and a heated exchange followed. *Id.*

According to Willis, Wiley hollered in her ear about the key, and Willis said, "don't ask me about that GD key." *Id.* But according to Wiley, Willis said, "I will give you these f*ing keys when I get good and ready. I will throw them in the bushes and whip your ass." Wiley Decl. [55-3] ¶ 24. Willis denies threatening Wiley but admits to cursing at Wiley in frustration. Am. Compl. [34] ¶ 40; [60] at 11. Wiley then told her to leave and not come back, and Wiley fired her the next day.

4

[57-4] at 32. Willis never returned the key. *Id.* Freddie said Wiley fired Willis for disrespecting her and "cuss[ing] her out," [60-2] at 16, but Anthony said they fired her because Wage and Hour told them they could not have employees who were not on payroll, A. Davis Depo. [60-3] at 14.

Wiley and Willis notoriously had a strained relationship during Willis's employment with Westhaven. *See* [60-2] at 13–14. Wiley believed Willis was disrespectful, improperly soliciting flower business from Westhaven's clients, and staying at Westhaven for too long during her free time. *Id.*; [57-1] at 41. Wiley approached her about those problems, but Willis did not stop. [57-1] at 41; [55-3] ¶¶ 8–9. Defendants claim they never fired Willis for any of that behavior because they knew Willis was a single mother. [55-3] ¶ 10.

When Defendants ultimately fired Willis, she had nearly completed her apprenticeship and finished almost all tasks necessary to take the licensing exam. [57-4] at 48. She needed one last form signed to be able to take the exam. *Id.* at 35. She tried to get Anthony's signature several times, but he would not sign it. *See id.* at 18, 35–36; [60-3] at 14; [60-11]. If Willis wanted to continue her apprenticeship after leaving Westhaven, she would either need to start over or request special permission from the Funeral Board. [60] at 7–8; [57-4] at 49–50. Willis attempted to join another funeral home, but her involvement in the Wage and Hour investigation at Westhaven allegedly made her a hiring risk. [57-4] at 48.

Willis has maintained her flower business since she left Westhaven, earning about $12,000 per year. [60] at 8; [57-4] at 29. She also worked as a bus monitor for

5

a charter school for about four hours per day in 2022, but that employment did not last long because she began near the end of the school year. [60] at 8; [57-4] at 28. She tried to open a funeral business, but it failed. [60] at 8; [60-4] at 27. She began working periodically as an independent contractor with C.J. Williams Mortuary Services, driving limos and doing pickups, in 2022. [60] at 8; [57-4] at 27–28.

Willis sued Westhaven, Wiley, Freddie, and Anthony on January 6, 2022. [1]. Her Amended Complaint asserts claims for failure to pay minimum wage, failure to pay overtime, and retaliation in violation of the FLSA. [34] at 10–12. Defendants move for summary judgment, and Willis moves for partial summary judgment on whether Wage and Hour's findings related to Willis's apprenticeship employment bind Westhaven.

II.   Standard

Summary judgment is appropriate if the movant shows "no genuine dispute as to any material fact" exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the applicable substantive law, its resolution could affect the outcome of the action." *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747 (5th Cir. 2019) (citation omitted). A dispute is "genuine" if evidence demonstrates that a "reasonable [factfinder] could return a verdict for the nonmoving party.'" *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court construes all facts and reasonable inferences in the non-movant's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

If the non-movant bears the burden of proof at trial, the movant need only demonstrate the record lacks evidentiary support for the non-movant's claim. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). The movant must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party need not "present evidence proving the absence of a material fact issue . . . [but] may meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Trans. Co.*, 402 F.3d 536, 544 (5th Cir. 2005) (citation omitted). That said, "unsubstantiated assertions are not competent summary judgment evidence." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant meets its burden, "the burden shifts to the non-movant to produce evidence of the existence of such an issue for trial." *Bayle*, 615 F.3d at 355 (quotation omitted). The non-movant must present more than "speculation, improbable inferences, or unsubstantiated assertions." *Jones*, 936 F.3d at 321 (citation omitted). The nonmovant's failure "to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citation omitted); *Est. of Thornton v. Rankin Cnty.*, 3:13-CV-620, 2015 WL 1650237, at *1 n.1 (S.D. Miss. Apr. 14, 2015). Notably, "Rule 56 does not impose upon the district court a duty to sift through the

7

record in search of evidence to support a party's opposition to summary judgment." *Ragas*, 136 F.3d at 458.

III. Analysis

Defendants move for summary judgment on two grounds. First, they have a legitimate, non-retaliatory reason for firing Willis, and Willis cannot show pretext. [55] at 7–8. Second, Willis failed to mitigate her damages after losing her job. *Id.* at 6–7. Willis moves for partial summary judgment on collateral-estoppel grounds. [58] at 6–7. The Court addresses Defendants' motion first.

A. Defendants' Motion for Summary Judgment

1. Pretext

Defendants first argue they fired Willis because she cursed at and threatened Wiley, and Willis cannot show that reason was pretextual. [55] at 7. Willis responds that she has significant evidence of pretext, and she was fired for participating in the Wage and Hour investigation rather than her misconduct.

The Court analyzes FLSA retaliation claims founded on circumstantial evidence under the burden-shifting framework created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Farmer v. Turn Key Installation, L.L.C.*, 812 F. App'x 200, 202 (5th Cir. 2020) (per curiam). Willis must first establish "a prima facie showing of: (1) participation in a protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Id.* at 202–03 (quoting *Starnes v Wallace*, 849 F.3d 627, 631–32 (5th Cir. 2017)). If she does that, the burden shifts to Defendants "to articulate a legitimate[,]

non[-]retaliatory reason" for her termination. *Id.* at 203 (citing *Starnes*, 849 F.3d at 632). The burden then shifts back to Willis "to identify evidence of pretext behind the termination." *Id.*

Defendants concede Willis can establish a prima facie case of retaliation in violation of the FLSA. *See* [55] at 7. They admit they fired her within a week of Wage and Hour requiring them to pay Willis $23,000 in back wages, and that temporal proximity sufficiently establishes a prima facie case of retaliation. *Id.* But they present a legitimate, non-retaliatory reason for Willis's termination—that Willis cursed and physically threatened Wiley. *Id.* Willis concedes in her Amended Complaint that she cursed Wiley out of frustration, *see* [34] ¶ 40, and she does not argue Defendants' reason is not legitimate and non-retaliatory, *see* [60] at 9. Defendants meet their burden, so Willis must prove pretext.

"Temporal proximity gets [Willis] through [her] prima facie case but does not, on its own, establish . . . pretext." *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019). Pretext "requires a showing of but-for causation, which requires more than mere temporal proximity." *Id.* at 243–44. But "[t]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment." *Id.* at 244 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

*Shackelford* and *Garcia* illustrate what "other significant evidence of pretext," along with temporal proximity, is sufficient. *See Garcia*, 938 F.3d at 244. In *Shackelford*, the plaintiff was fired the same week her supervisors discovered her

9

protected activities—participating in a class-action discrimination lawsuit and attempting to raise discrimination concerns to her supervisors. *See* 190 F.3d at 408. Her evidence of pretext included that temporal proximity along with (1) her factual disputes with the defendant over events leading up to her termination, (2) warnings from her coworkers to not get involved with the class action, and (3) evidence that a similarly situated employee did not receive the same poor reviews as the plaintiff even though they had the same problems. *Id.* at 409. The Court found that body of evidence sufficient to create a genuine dispute as to pretext. *See id.* at 409–10.

In *Garcia*, the plaintiff was fired 76 days after blowing the whistle on his company's billing practices. *See Garcia*, 938 F.3d at 239–40, 243. His employer argued they fired him when they found out he failed to properly service two jobs. *Id.* at 239. Like *Shackelford*, his evidence of pretext included that temporal proximity along with factual disputes of events leading up to his termination and a similarly situated employee who did not receive the same treatment for similar conduct. *See id.* at 244. But he also supplied evidence that (1) his supervisor harassed him after the company found out about his whistleblowing, (2) the company knew about his failure to properly service the two jobs long before they fired him, and (3) the company would have lost millions of dollars if its billing practices were discovered. *Id.* The Fifth Circuit found his body of evidence "just as strong—if not stronger—than the body of evidence in *Shackelford*," and sufficient to create a genuine dispute of material fact as to pretext.

Wallace's body of evidence is somewhere between *Shackelford* and *Garcia*, both of which involved "other significant evidence of pretext" sufficient to survive summary judgment. Defendants acknowledge the suspicious timing between Wage and Hour's findings and Willis's termination. *See* [55] at 7. And Willis cites this other evidence of pretext: (1) Wiley saying she would no longer employ interns after Wage and Hour told her she had to pay them, [57-8] at 7; (2) Defendants suffering financial loss from having to pay Willis, and Wiley and Freddie meeting with Willis about her back wages that same day, [57-4] at 17; [57-2] at 13; (3) Wiley asking Willis for the key to the funeral home two days after Wiley's meeting with Castillo, "hollering" at Willis when she told Wiley it was at her house, and subsequently banishing Willis from the premises, [57-4] at 31; (4) Wiley firing Willis the day after that incident and two days after Castillo warned Wiley against retaliation for cooperation in Wage and Hour's investigation, *see* [60] at 11; (5) Anthony testifying that Wage and Hour required Westhaven to dismiss any employees that were not on payroll, [57-3] at 14–15; and (6) Defendants previously tolerating Willis's misconduct and insubordination, [55-3] ¶¶ 10, 15.

Defendants' only response to that evidence is to explain why they tolerated Willis's previous disrespect and insubordination—because she was a single mother—and to highlight the high burden of proving but-for causation for pretext. *See* [65] at 1–2. That argument fails for two reasons. First, at this stage, Willis need only show a genuine dispute of material fact to survive summary judgment—not to conclusively prove the but-for cause of her termination was her participation in the

11

Wage and Hour investigation. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017) (explaining pretext sufficient to defeat summary judgment as "evidence that could lead a reasonable fact-finder to conclude that 'the adverse employment action would not have occurred 'but for' the employee's decision to engage in a [protected activity]") (citation omitted).

Second, even without the evidence of Defendants' previous tolerance, Willis presents other significant evidence: (1) Defendants suffering financial loss for having to pay Willis back wages; (2) disputing facts leading up to her termination, including the conversation between Willis, Wiley, and Freddie Davis about Willis repaying her back pay to Westhaven; (3) Wiley telling Castillo that she would no longer employ interns if she had to pay them; (4) Wiley asking Willis to return her key to the funeral, banishing her from the property, and firing her within two days of Wage and Hour completing its investigation; and (5) Anthony Davis testifying that Wage and Hour required Westhaven to dismiss any employees that were not on payroll. The Fifth Circuit has affirmed denial of summary judgment for less circumstantial evidence of pretext than that. *See Garcia*, 938 F.3d at 244 (comparing plaintiff's evidence to body of evidence in *Shackelford*, 190 F.3d at 409).

A genuine dispute exists over whether Defendants' reason for firing Willis was pretextual. Accordingly, the Court denies summary judgment on Willis's retaliation claim.

2. Mitigation of Damages

Defendants next argue Willis failed to mitigate her damages by looking for other gainful employment. [55] at 6–7. Willis responds that Defendants fail to recognize her self-employment and other attempts to find work. [60] at 13.

Plaintiffs "have a duty to mitigate back-pay damages by using reasonable diligence to obtain substantially equivalent employment." *Schaeffer v. Warren Cnty.*, No. 3:14-CV-945, 2017 WL 5709640, at *2 (S.D. Miss. Nov. 27, 2017) (quoting *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1045 (5th Cir. 1998)) (reviewing post-trial motion in FLSA retaliation case). "Substantially equivalent employment . . . affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the claimant has been [retaliatorily] terminated." *Id.* (quoting *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)). If the plaintiff fails to make that effort, the amount she could have earned will reduce the back-pay amount. *Id.*

The Fifth Circuit has not clarified an employer's burden to prove the affirmative defense of failure to mitigate. In *Sparks v. Griffin*, it placed on employers the burden of showing availability of substantially equivalent work even if a plaintiff failed to demonstrate reasonable effort to find that work. *See* 460 F.2d 433, 443 (5th Cir. 1972). But in *Sellers v. Delgado College*, the Fifth Circuit relieved employers of that burden, and only required them to prove a plaintiff failed to demonstrate reasonable effort. *See* 902 F.2d at 1193. Defendants urge the Court to follow *Sellers* so they do not have to prove availability of substantially equivalent

13

employment. *See* [55] at 6–7; [65] at 3–5. Yet Willis asks the Court to follow *Sparks* based on the "rule of orderliness,"[2] and require Defendants to prove availability. *See* [60] at 13–15.

Willis relies on *Storr v. Alcorn State University,* where Judge Daniel P. Jordan III applied *Sparks* based on the rule of orderliness and "[a] solid majority" of district courts within the Fifth Circuit reaching the same conclusion. *See* No. 3:15-CV-618, 2017 WL 3471191, at *4 (S.D. Miss. Aug. 11, 2017) (collecting cases and reviewing motion in limine seeking to exclude evidence of failure-to-mitigate defense). Judge Jordan followed the same approach three months later on a post-trial motion to reconsider a finding that the defendants affirmatively proved failure to mitigate. *See Schaeffer*, 2017 WL 5709640, at *2–3 (following *Sparks* but noting lower *Sellers* burden would "bolster[] the [Court's previous] mitigation ruling").

On the other hand, Defendants rely on *Rybar v. Corporate Management, Inc.*, where Judge Keith Starrett recognized the rule of orderliness but applied *Sellers* because it was the more recent decision, and the Fifth Circuit had applied *Sellers* more often than *Sparks*. *See* No. 1:14-CV-242, 2015 WL 12912342, at *1–2 (S.D. Miss. Jul. 16, 2015) (reviewing motion in limine seeking to exclude evidence that plaintiff intentionally failed to look for work). They also argue the lack of consistency in applying the rule of orderliness warrants following Judge Starrett's

---

[2] The rule of orderliness says, "one panel of [the Fifth Circuit] may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the Fifth Circuit's] en banc court." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *6 (5th Cir. Feb. 17, 2022) (quoting *Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)).

rationale.[3] *See* [65] at 4–5. But Judge Starrett acknowledged the rule of orderliness and only declined to follow it in the specific context of failure to mitigate. *See Rybar*, 2015 WL 12912342, at *2 ("Fifth Circuit panels have had an opportunity to apply the 'Rule of Orderliness' *in this context*, and they have not done so.") (emphasis added). In other words, despite their varying conclusions, both *Rybar* and *Storr* agree on the rule of orderliness's legitimacy.

The Fifth Circuit is in a better position to revisit its own rules, such as the rue of orderliness, than this Court. *See Schaeffer*, 2017 WL 5709640, at *3 ("At some point, the Fifth Circuit will likely resolve [the *Sparks* and *Sellers*] dispute . . . [b]ut until that happens, this Court will follow the rule of orderliness . . . ."). Based on *Storr*, *Schaeffer*, *Rybar*, and the "solid majority" of courts following *Sparks*, the Court rejects Defendants' argument against the rule of orderliness and applies *Sparks*. *See Storr*, 2017 WL 3471191, at *4.

Turning to the merits, *Sparks* requires Defendants to prove the availability of substantially equivalent employment for Willis for their failure-to-mitigate defense to warrant summary judgment. *See Sparks*, 460 F.2d at 443. Willis argues they fail to meet that burden. *See* [60] at 13–15. Defendants concede they did not show the

---

[3] Defendants argue the Fifth Circuit recently rejected the rule of orderliness when it concluded its earlier decision was erroneous. [65] at 4 (citing *Thompson v. Dallas City Att'ys Off.*, 913 F.3d 464, 466 (5th Cir. 2019)). Not so. The Fifth Circuit found the earlier decision contradicted existing Supreme Court precedent, and that conclusion is consistent with the rule of orderliness. *See Thompson*, 913 F.3d at 466 (noting earlier decision "was a one-off that was swiftly cast off."). The Fifth Circuit then referred to the rule of orderliness as "binding," *see id.*, and has since referred to it as "strict and rigidly applied," *Sambrano*, 2022 WL 486610, at *6 (quoting *Bonvillian*, 19 F.4th at 792). Defendants cite no other authority to suggest the Fifth Circuit no longer follows the rule.

availability of substantially equivalent work. *See* [65] at 2 ("Westhaven admittedly did not show that substantially equivalent work was available in the marketplace."). Having failed to do so, Defendants fail to show summary judgment is appropriate for their failure-to-mitigate defense. Accordingly, the Court denies their [55] Motion for Summary Judgment.

    B.  Willis's Motion for Partial Summary Judgment

Willis argues Defendants are bound to Wage and Hour's findings that the FLSA applied to Willis's employment with Westhaven. [58] at 6–7. Defendants do not dispute that Westhaven is an enterprise and Willis is an employee under FLSA, but they do not agree that the "findings of a low-level investigator"—Castillo—bind Westhaven. [61]. The Court finds Willis's motion as moot given Defendants' concession that Westhaven is an enterprise and Willis is an employee under the FLSA. *See id.*

IV.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the stated reasons, the Court DENIES Defendants Westhaven Funeral Home, Inc.'s, Freddie L. Davis's, Anthony Davis's, and Audrey B. Wiley's [55] Motion for Summary Judgment and FINDS AS MOOT Plaintiff Sharon Willis's [57] Motion for Partial Summary Judgment.

SO ORDERED, this the 18th day of May, 2023.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE
